UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASHOK NEPAL, *et al.*,<br><br>            Plaintiffs,<br><br>            v.<br><br>THE UNITED STATES DEPARTMENT<br>OF STATE, *et al.*,<br><br>            Defendants. | Case No. 1:21-cv-01073 (TNM) |

**MEMORANDUM OPINION**

The United States issues up to 55,000 "diversity visas" each year, permitting citizens of otherwise underrepresented countries to move here.  Plaintiffs (the Applicants) were selected as potential recipients of diversity visas in the 2021 annual lottery (DV2021) run by the State Department.  But as the COVID-19 pandemic intensified, the Department deprioritized adjudicating diversity visas and the Applicants never received a final decision on their applications.

They sued, alleging the Department and its agents (collectively, the Government) violated federal law in failing to timely resolve their applications.  The Government now moves to dismiss.  In its view, those claims are moot because the Immigration and Nationality Act (INA) says DV2021 applicants are not eligible to receive a visa after the fiscal year expires.  The Government also argues the Applicants lack standing and that their claims fail on the merits.  The Court will grant the motion to dismiss.  Because the Department cannot grant Applicants a diversity visa after the fiscal year has expired, most of their claims for injunctive and declaratory

relief are moot. The remaining claims either must be dismissed for lack of subject matter jurisdiction or for failure to state a claim.

### I.

### A.

Each year, the State Department issues up to 55,000 "diversity visas" to applicants from countries with low levels of immigration to the United States. *See* 8 U.S.C. § 1153(c); *id.* § 1151(e). The diversity visa process is "competitive and complicated." *Almaqrami v. Pompeo*, 933 F.3d 774, 776 (D.C. Cir. 2019). That process begins with an applicant entering a random "lottery" held every fiscal year.[1] *See* 8 U.S.C. § 1153(e); 22 C.F.R. § 42.33(b)–(c). Lottery winners (or "selectees") then submit an immigrant visa application (Form DS-260) and other required documents to the Kentucky Consular Center (KCC), eventually receiving a "documentarily qualified" certification and a visa number.[2] *See* 8 U.S.C. § 1202(a), (b); 22 C.F.R. § 42.61–42.67. Once a selectee receives a visa number, he may schedule a consular interview. *See* 8 U.S.C. § 1202(h); 22 C.F.R. § 42.62. But a consular officer will not issue a visa until the officer determines a selectee is eligible. *See* 8 U.S.C. § 1201(g).

---

[1]  More than 6.7 million principal applicants sought a diversity visa in 2021. *See* Diversity Visa Program, DV 2019–2021, available at https://travel.state.gov/content/dam/visas/Diversity-Visa/DVStatistics/DV-applicant-entrants-by-country-2019-2021.pdf (last visited Apr. 24, 2022). Out of those applicants, "there were 71,817 [principal] selectees, who along with spouses and children total 137,969 prospective DV applicants." Mem. in Supp. of MTD (MTD) 25, ECF No. 47-1.

[2]  The KCC is a "contract processing facility" that "carries out all production and research work using employees of a prime labor contractor rather than with direct-hire U.S. Government employees." Suppl. Compl. ¶ 426. The staff at KCC "do[] not have [ ] authority to adjudicate an applicant's entitlement to a visa or make substantive decisions affecting the processing of visa applications." *Id.*

Critically here, the INA says a selectee "shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected." 8 U.S.C. § 1154(a)(1)(I)(ii)(II); *see also* 22 C.F.R. § 42.33(d) (providing that, at the end of the fiscal year, "the Department of State will consider approval of the petition to cease to be valid"). In practice, that means the Department will not issue a diversity visa "after midnight on September 30 of the selection [fiscal year]." *Almaqrami*, 933 F.3d at 777.

Unsurprisingly, COVID-19 seriously degraded the State Department's ability to process immigrant visa applications. In March 2020, "at the onset of the global [ ] pandemic, the State Department suspended all routine visa processing services, including under DV21." *Gorgadze v. Blinken*, No. 21-cv-2421, 2021 WL 4462659, at *2 (D.D.C. Sept. 29, 2021). Soon after, President Trump issued Presidential Proclamation 10014, prohibiting diversity visa selectees from entering the United States. *See* Proclamation 10014 (PP10014), 85 Fed. Reg. 23,441 (Apr. 22, 2020). The proclamation exempted "any alien whose entry would be in the national interest," *id.* at 23,443 § 2(b)(ix), but it made no specific exception available for diversity-visa applicants.

The State Department interpreted PP10014 as limiting its ability to issue diversity visas and stopped adjudicating DV2021 applications altogether. *See Gorgadze*, 2021 WL 4462659 at *2; Am. Compl. ¶ 901, ECF No. 13. Because of these policy changes, the Applicants say, "no principal DV2021 approved petitioner residing overseas was scheduled for an interview from 1 October 2020 until 11 March 2021." Am. Compl. ¶ 914.

The Department eventually relaxed some of its COVID-related restrictions. In July 2020, it issued guidance creating the Diplomacy Strong framework, a "phased approach to the resumption of routine visa services." *Filazapovich v. Dep't of State*, 560 F. Supp. 3d 203, 218

3

(D.D.C. 2021) (quotation omitted). Still, "the adjudication of diversity visas would remain suspended unless a diversity visa applicant was excepted by [PP10014]." Am. Compl. ¶ 902. In November 2020, the Department implemented a new four-tiered approach, relieving consular posts from the strict requirements of Diplomacy Strong but still relegating diversity visas to the lowest priority. *See id.* ¶ 909.

Shortly after taking office, President Biden revoked PP10014 and issued new guidance to the State Department, but he did not rescind the Department's four-tier approach. *See* Am. Compl. ¶ 915; Presidential Proclamation 10149, 86 Fed. Reg. 11,847 (Feb. 24, 2021). According to the Applicants, "Defendants [ ] instructed consulates that it [would] remain in place beyond . . . the fiscal year." Am. Compl. ¶ 917. As of August 2021, "[t]he KCC prime contractor stopped all DV2021 processing." Supp. Compl. ¶ 441, ECF No. 49. All told, the Department issued only 17,344 diversity visas out of the 55,000 available slots for 2021.[3]

**B.**

Plaintiffs are 153 principal selectees in the 2021 diversity visa program and their derivative beneficiaries.[4] *See* Pl.'s Opp. to MTD (Opp.) 7, ECF No. 51. Each submitted the required DS-260 and accompanying documents and were accordingly eligible for a consular interview. *See* Notice of Withdrawal, Ex. 1 ¶¶ 11–941, ECF No. 42-1; Supp. Compl. ¶¶ 17–402, 403. Yet because of the Department's COVID-related polices, the Applicants allege, they "have

---

[3] *See* Immigrant Visas Issued, available at https://bit.ly/3MoueIE (last visited Apr. 24, 2022).

[4] After litigation commenced, the Department issued immigrant visas to 31 Applicants. See Notice of Withdrawal ¶ 1, ECF No. 42. Some withdrew their claims altogether, while others retain certain claims for retrospective relief. See *id.* ¶¶ 4–7.

4

received no meaningful response" from the Department or its agents about their DV2021 applications. Opp. 7.

Applicants sued in April 2021, alleging the Government had violated the INA, 8 U.S.C. § 1101 *et seq.*; the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*; the Fifth Amendment's Due Process Clause, U.S. Const. amend. V; and the Rehabilitation Act, 29 U.S.C. § 701 *et seq. See* Compl. ¶¶ 891–964, ECF No. 1. As the end of the fiscal year approached, they sought a temporary restraining order requiring the Department to (1) transfer certain Plaintiffs' DV2021 applications from KCC to the Prague consulate and (2) adjudicate pending DV2021 applications before the deadline expired. *See* Mot. for TRO and Emergency Adjudication, ECF No. 31. This Court denied emergency relief, explaining that it would "not insert itself into this executive branch program at the eleventh hour to pick winners and losers." Mem. Order 4, ECF No. 36.

Applicants later supplemented their complaint to add allegations concerning the Government's conduct between July 2021 and September 2021.[5] *See* ECF No. 49; *see also* Opp. 10–13 (listing eleven remaining claims). The fiscal year passed, and the Government now moves to dismiss; its main argument is that expiration of the INA's statutory deadline moots Applicants' claims. *See* MTD, ECF No. 47. The motion is ripe for resolution.

## II.

A complaint must contain "a short and plain statement of the grounds for the court's jurisdiction," as well as a "statement of the claim showing that the pleader is entitled to relief."

---

[5] Much of the Supplemental Complaint concerns the Government's continued failure to adjudicate the Applicants' visas or transfer visa applications to available consulates. *See* Supp. Compl. ¶¶ 459–503. The supplement also includes a new claim for mandamus, alleging the Government failed to comply with certain mandatory injunctions issued by other courts. *See id.* ¶¶ 504–514.

Fed. R. Civ. P. 8(a)(1), (2).  A defendant may move to dismiss for failure to satisfy either of these requirements.  *See id.* 12(b)(1), (6).

When a defendant moves to dismiss for lack of subject matter jurisdiction, the court must presume that "a cause lies outside [its] limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), and the plaintiff bears the burden of overcoming that presumption, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  While the Court will accept factual allegations in the complaint as true, those allegations "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Common Purpose USA, Inc. v. Obama*, 227 F. Supp. 3d 21, 21 (D.D.C. 2016) (cleaned up).  And the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."  *Jerome Stevens Pharma., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

To survive a motion to dismiss for failure to state a claim, by contrast, a complaint need only contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  And while a complaint need not contain "detailed factual allegations," it must offer more than "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

### III.

The Court begins, as it must, with jurisdiction. *See Ex Parte McCardle*, 74 U.S. 506, 514 (1868) ("Without jurisdiction the court cannot proceed at all in any cause.").

6

A core limitation on Article III jurisdiction is the doctrine of standing. To press his claims in federal court, a plaintiff must establish the "irreducible constitutional minimum" of standing: that he has suffered (1) an injury in fact (2) caused by, and traceable to, the defendant's allegedly unlawful conduct and (3) that a favorable judicial decision is "likely" to redress that injury. *Lujan*, 504 U.S. at 560. And because "standing is not dispensed is gross," a "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (cleaned up); *accord Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983).

Plaintiffs must also "maintain a personal interest in the dispute" throughout "all stages of litigation." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021). Standing "assesses whether that interest exists at the outset, while the doctrine of mootness considers whether it exists throughout the proceedings." *Id.*; *see also* Henry Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale L.J. 1363, 1384 (1973) (explaining that mootness is "the doctrine of standing set in a time frame"). If during "litigation a court finds that it can no longer provide a plaintiff with any effectual relief, the case is generally moot." *Uzuegbunam*, 141 S. Ct. at 796. This requirement, like standing, applies to every form of relief a litigant seeks. *See, e.g.*, *In re Smith*, 114 F.3d 1247, 1249 (D.C. Cir. 1997) (holding that a request for habeas relief was moot but that claims for injunctive, declaratory, and monetary relief were not).

Applicants seek several remedies: an injunction, mandamus, declaratory relief, and nominal damages. *See* Am. Compl. 99–100; Supp. Compl. 202–203. The Government's main argument is that these claims are moot because the fiscal year has expired, making DV2021 selectees ineligible to receive a visa. The Court considers that argument as to each form of relief.

A.

The Applicants' claims for injunctive and mandamus relief are straightforwardly moot because the Court cannot lawfully grant them. In their amended and supplemental complaints, the Plaintiffs ask the Court to:

- order the Department to adjudicate their pending DS260 applications;
- order the Department to allow the named plaintiffs to schedule medical examinations when their rank numbers become current; and
- order the Department to implement a rational process for plaintiffs to request consideration for waivers, emergency adjudication, transfer to other consulates and/or expedited visa interview scheduling.

Am. Compl. 99–100; Supp. Compl. 202–203.

The Court cannot grant this relief. The INA says diversity-visa selectees are "eligible to receive such visa only through the end of the specific fiscal year for which they were selected." 8 U.S.C. § 1154(a)(1)(I)(ii)(II). The 2021 fiscal year has ended. So even if the Applicants show the State Department unlawfully withheld visa-adjudication, this Court could not—consistent with Congress's unambiguous command—order the Department to adjudicate their applications and issue documentarily qualified selectees a visa. *See Rees v. Watertown*, 86 U.S. 107, 122, (1874) ("A Court of equity cannot, by avowing that there is a right but no remedy known to the law, create a remedy in violation of law . . . ."); *cf. INS v. Pangilinan*, 468 U.S. 875, 885 (1988) ("Neither by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does a court have the power to confer citizenship in violation of [statutory] limitations.").

And because it would be impossible to grant injunctive or mandamus relief here, any claims to those forms of relief are moot.[6] *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*,

---

[6] For similar reasons, the Court will dismiss the Applicants' freestanding claims for equitable estoppel and tolling. The Court agrees with the Ninth Circuit that "the doctrine of equitable

8

139 S. Ct. 1652, 1660 (2019).  Many courts agree.  *See, e.g.*, *Zixiang Li v. Kerry*, 710 F.3d 995 (9th Cir. 2013); *Mwasaru v. Napolitano*, 619 F.3d 545 (6th Cir. 2010); *Smirnov v. Clinton*, 806 F. Supp. 2d 1 (D.D.C. 2011), *aff'd*, 487 F. App'x 582 (D.C. Cir. 2012).

Seeking to avoid that conclusion, Applicants say the availability of a remedy "is a merits question, not a mootness question."  Opp. 39.  They rely on the D.C. Circuit's decision in *Almaqrami*, 933 F.3d 774.  *See* Opp. 38–40.  There, plaintiffs were diversity-visa selectees who sought to challenge the State Department's implementation of President Trump's so-called "travel ban."  933 F.3d at 777–78 (discussing the challenged "Guidance Memo").  While the Supreme Court heard appeals related to the travel ban, the district court "ordered the State Department to report the number of unused visa numbers for FY 2017 and hold those visa numbers to process plaintiffs' visa applications" in case the Supreme Court ruled the travel ban was unlawful.  *Id.* at 778.  The district court ultimately dismissed the suit as moot when the Executive rescinded the travel ban and the challenged Guidance Memo.  *Id.* at 779.

On appeal, the Government argued the mootness dismissal should be affirmed because (among other reasons) the fiscal year had expired, meaning § 1154 prohibited the Government from issuing any more diversity visas to that years' selectees.  *See id.* at 780.  The panel rejected that argument on a distinctly fact-bound basis.  It explained there are a few different types of diversity-visa suits.  There are cases like ours, in which "a plaintiff files suit before the selection

---

tolling has no application in cases involving the Congressionally-mandated, one-year deadline of the DV Lottery Program."  *Carrillo-Gonzalez v. INS*, 353 F.3d 1077, 1079 (9th Cir. 2003); *see also Mwasaru*, 619 F.3d at 551 (adopting *Carrillo-Gonzalez*'s equitable tolling holding); *cf. Pangilinan*, 486 U.S. at 883 ("Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law.").  More, nothing in the operative complaints show the kind of "false representation[s]" necessary to establish entitlement to equitable estoppel.  *ATC Petroleum, Inc v. Sanders*, 860 F.2d 1104, 1111 (D.C. Cir. 1988); *see also id.* (noting that application of equitable estoppel to the Government "must be rigid and sparing").

9

FY ends but the court fails to act on that request until after September 30, at which point the State Department lacks authority to issue a diversity visa." *Id.* The panel recognized that those cases were moot. *See id.* Then there are cases like Almaqrami's, in which the "plaintiff files suit and the court grants *some* relief—but not the visa—before October 1." *Id.* In that latter class of cases, there could be an open question about whether the district court could "order the State Department to do anything with [ ] unused visa numbers held in reserve" under its earlier order. *Id.* at 781. That issue was "a merits question," not a mootness question, "*in the context of [Almaqrami's] case*." *Id.* (emphasis added); *see also id.* at 784 (reversing dismissal).

That makes sense. The Supreme Court has said disputes are moot only where "it is impossible . . . to grant any effectual relief." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013). The *Almaqrami* district court's preliminary order left open the possibility of further relief, *see* 933 F.3d at 781 (noting the order "need not be read to limit the authority of the district court to grant additional relief to a scenario in which the Supreme Court finds EO 13780 unlawful"), so there was a live question about whether that further relief might include directing the State Department to issue the plaintiffs a visa. But this case does not present that question. The Court denied Applicants' request for a temporary restraining order and emergency relief. *See* Mem. Order, ECF No. 36. And because this Court declined to grant "relief . . . before October 1[,]" there is no concomitant justiciable question about whether the State Department can do anything "pursuant to the [earlier] Order." *Almaqrami*, 933 F.3d at 781.

Undeterred, the Applicants say they *have* "received specific relief . . . in their favor before the expiration" of the fiscal year. Opp. 57. That "relief" purportedly comes from two other district court decisions: *Rai v. Biden*, No. 21-cv-863, 2021 WL 4439074 (D.D.C. Sep. 27, 2021), and *Filazapovich*, 560 F. Supp. 3d 203.

10

In *Rai*, another judge in this district ordered the Department to "expeditiously process and adjudicate diversity visas prior to September 30, 2021, and to reserve diversity visas after September 30, 2021, for processing and adjudication at those embassies and posts impacted by the regional No-Visa Policy." 2021 WL 4439074 at *15. The *Rai* court later clarified its order, requiring the Department to "begin processing and adjudicating the 966 reserved fiscal year 2021 diversity visa applications" mentioned in its previous order. *Rai v. Blinken*, No. 21-cv-863, 2021 WL 5765883, at *2 (D.D.C. Oct. 25, 2021).

Similarly, in *Filazapovich*, a district judge ordered the Department to "undertake good-faith efforts, directly and through their designees, to expeditiously process and adjudicate DV-2021 applications." 560 F. Supp. 3d at 236. As the expiration of the fiscal year approached, the court further ordered the Department to "reserve 6,914 diversity visas for adjudication pending final judgment" in one of several consolidated related cases, and to "adjudicate the 481 diversity visas" reserved in another "by the close of Fiscal Year 2022." *Filazapovich v. Dep't of State*, No. 21-cv-943, 2021 WL 4476844, at *6 (D.D.C. Sept. 30, 2021).

But *Rai* and *Filazapovich* do not save this case from mootness. *Almaqrami* reversed the district court's dismissal because live questions remained as to the scope of *that same court's* preliminary order. The panel did not bless what Applicants attempt here: creating a live dispute by raising questions about the scope of a *different court's* order in a lawsuit involving *different plaintiffs*.

Generally, "one district court decision is not binding on another district court." *Am. Council of the Blind v. Wash. Metro. Area Transit Auth.*, 133 F. Supp. 2d 66, 74 n. 2 (D.D.C. 2001). And because *Rai* and *Filazapovich* are not binding, there is no justiciable question about

whether this Court could "order the State Department to do anything . . . pursuant to [those courts'] Order[s]." *Almaqrami*, 933 F.3d at 781.

Perhaps Applicants seek to invoke a version of nonmutual offensive collateral estoppel. That doctrine applies when "a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against . . . a different party." *United States v. Mendoza*, 464 U.S. 154, 159 n.4 (1984); *see also Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322 (1979) (blessing nonmutual estoppel). As the argument would go, collateral estoppel requires the Government (and apparently this Court) to give the *Rai* and *Filazapovich* remedies binding effect; there is thus a live question whether this Court could require the Department to undertake further action under those orders. But there's a hitch— nonmutual collateral estoppel does not apply against the Government. *See Mendoza*, 464 U.S. at 160 ("A rule allowing nonmutual collateral estoppel against the government . . . would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue."). That means estoppel does not make *Rai* and *Filazapovich* binding, and there is no reason to treat a question as to the scope of remedies granted in those decisions as a justiciable controversy.

Or perhaps Applicants believe *Rai* and *Filazapovich* made possible what was previously impossible. That argument would be straightforward: those decisions required the Department to retain diversity visa applications that otherwise would have been ineligible after September 2021.

But that argument proves too much. *Rai* and *Filazapovich* ordered the Department to reserve and adjudicate thousands of visas, including visas—according to the Applicants—"for Plaintiffs like Igoshina, Chieva, Piddubna, Sidarenka, Antonchik, and Khalmatova." Opp. 57. It

12

is not obvious what further relief this Court could grant those covered Applicants. They are getting exactly what they want—the Department must expeditiously resolve their visa applications. *See Rai*, 2021 WL 5765883 at *2; *Filazapovich*, 2021 WL 4476844 at *6. If the Applicants think the Department has failed to comply with the orders in *Rai* and *Filazapovich*, those concerns are better directed to the issuing courts. *Cf. Shillitani v. United States*, 384 U.S. 364, 370 (1966) ("[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt."). And if Applicants in this matter are *not* covered by either decision, the status quo is unchanged.

More fundamentally, *Rai* and *Filazapovich* are inconsistent with the Supreme Court's precedent in comparable cases. Consider *Pangilinan*, 486 U.S. 875. Plaintiffs in that case were Filipino nationals who sought to apply for and receive American citizenship under the Nationality Act of 1940 (the Act), 8 U.S.C. §§ 1001–1005 (1940 ed., Supp. V). 486 U.S. at 879–881. The Act authorized foreign nationals who fought for the Allies in World War II to secure citizenship in the United States, even though many did not meet the requirements for naturalization. *See id.* at 877–78 (noting the "Act exempted those aliens from such naturalization requirements as five years of residency in the United States and proficiency in the English language"). But after the newly independent Filipino government complained about the potential of mass emigration, the United States revoked naturalization authority from its officials in the country and did not designate a new naturalization official until just five months before the Act was set to expire. *See id.* at 879–880.

The *Pangilinan* plaintiffs—Filipino veterans eligible for naturalization—sued decades later, arguing that the Government's decision to revoke its officials' naturalization authority violated the mandatory nature of the Act. *See id.* at 881. The Ninth Circuit agreed and ordered

13

the INS to naturalize the plaintiffs, notwithstanding expiration of the statutory deadline. *Id.* at 882. The Supreme Court reversed. Previous cases made clear that "equitable remedies" may not "override a public policy established by Congress." *Id.* at 883 (citing *INS v. Hibi*, 414 U.S. 5 (1973) (holding that estoppel did not toll the Act's statutory deadline)). In the context of the Nationality Act, "[t]he congressional command [ ] could not be more manifest" because there was "an explicit cutoff date." *Id.* at 884. And "[n]either by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does a court have the power to confer citizenship in violation of these limitations." *Id.* at 885.

*Rai* and *Filazapovich* are hard to square with that reasoning. Congress established a clear policy in the INA—diversity visa applicants are not eligible to receive a visa after expiration of the fiscal year. *See* 8 U.S.C. § 1154(a)(1)(I)(ii)(II). There is no exception for when the Department fails to timely adjudicate and issue 55,000 visas before the deadline. As in *Pangilinan*, "[t]he congressional command here could not be more manifest" because there is an "explicit cutoff date." 486 U.S. at 884. Despite that command, the *Rai* and *Filazapovich* courts ordered the Department to adjudicate statutorily ineligible DV2021 applications. In doing so, those courts relied on "equitable remedies" to "override a public policy established by Congress." *Id.* at 883. And they did so without ever distinguishing *Pangilinan*.[7]

*Rai* and *Filazapovich* are mirages; they cannot save Plaintiffs' causes from mootness.

\*   \*   \*

The Applicants' claims for injunctive and mandamus relief are moot, so those claims must be dismissed for lack of subject matter jurisdiction. *See Ex Parte McCardle*, 74 U.S. at 514

---

[7] It is no answer to say the Executive *itself* disregarded congressional policy in failing to timely adjudicate DV2021 applications. Compounding allegedly unlawful behavior with an unlawful remedy only does further disservice to the law, it does not vindicate it.

14

("Jurisdiction is the power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").

**B.**

The Applicants' claims for declaratory relief are likewise moot. In their operative complaints, Plaintiffs ask the Court to issue a declaration that:

- the Government has acted in bad faith towards the named DV2021 plaintiffs;
- the challenged "practices and implementations are unlawful, in bad faith, ultra vires, arbitrary and capricious, and that they constitute abuse of process; and
- that applying the September 30th, 2021, deadline to the named plaintiffs violates their statutory, regulatory, and constitutional rights to substantive, procedural, and regulatory due process.

Am. Compl. 99–100; Supp. Compl. 202–203.

Because the State Department may not issue any further diversity visas, *see* 8 U.S.C. § 1154(a)(1)(I)(ii)(II), these declarations would be merely advisory. Applicants think otherwise—they say declaratory judgment would have remedial effect in three ways. *First*, they say a declaratory judgment "would assure that at least those Plaintiffs that are beneficiaries of the *Rai* injunction would be able to have their applications processed unimpeded by unlawful regulatory barriers." Opp. 40. *Second*, it "would provide each Plaintiff with a notice of decision as to [their] eligibility to benefit from injunctions in favor of DV2021 applicants." *Id.* And, *third*, it "would avoid a repeat of errors of this magnitude, which could be used for adjudication of subsequent DV programs." *Id.*

The first and second arguments fail for the reasons discussed above—*Rai* and *Filazapovich* are not binding on this Court, so there is no justiciable controversy about the covered Applicants' entitlement under those decisions; nor is there a live question about the lawfulness of alleged "regulatory barriers" to obtaining that entitlement.

15

The third argument appears to invoke an exception to mootness that applies when issues are "capable of repetition, yet evading review." *S. Pac. Terminal Co. v. Interstate Com. Comm'n*, 219 U.S. 498, 515 (1911); *see also* Opp. 41.  That exception applies if a litigant shows: "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again." *Clarke v. United States*, 915 F.2d 699, 704 (D.C. Cir. 1990) (en banc) (cleaned up).  As for prong two, the Circuit has made clear that "the 'wrong' that is, or is not, 'capable of repetition,' must be defined in terms of the precise controversy it spawns." *People for the Ethical Treat. of Animals, Inc. v. Gittens (PETA)*, 396 F.3d 416, 422 (D.C. Cir. 2005).

Here, there is no "reasonable expectation" that Applicants "would be subjected to the same action again." *Clarke*, 915 F.2d at 704.  Consider all the facts causing their injuries: the Plaintiffs were randomly selected from over 6.7 million applicants in the DV2021 program; the world experienced a once-in-a-generation viral pandemic; then the State Department and two presidential administrations adopted ad hoc policies to respond to that pandemic, which had the effect of substantially curtailing diversity-visa adjudication.  Given these unique circumstances, it is unlikely any of these individuals will suffer "the same wrong again," *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 481 (1990), and by extension it is unlikely this "precise controversy" will arise again, *PETA*, 396 F.3d at 422.

In any case, granting declaratory judgment is discretionary.  *See generally Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) ("[A] district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment before trial or after all arguments have drawn to a close.").  Courts often decline to exercise that

discretion where it is unclear declaratory judgment would have any real remedial effect. *See* 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2759 (4th ed. 2022) ("One of the most important considerations that may induce a court to deny declaratory relief is that the judgment sought would not settle the controversy between the parties."). That's doubly true when, as here, declaratory judgment in Applicants' favor would render a pseudo-advisory opinion on a significant question of administrative and constitutional law. *See id.* ("[C]ourts particularly are reluctant to resolve important questions of public law in a declaratory action."). So even if the Applicants could satisfy the "capable of repetition yet evading review" standard, this Court would still decline to grant declaratory relief.

### C.

The last question is whether Applicants' claims for nominal damages are moot. They are not. If the Plaintiffs proved the Government acted unlawfully, they might be entitled to nominal damages. That's true even if injunctive and declaratory relief are unavailable. *See Uzuegbunam*, 141 S. Ct. at 802 (holding that a request for nominal damages preserves the justiciability of a controversy, even where other claims for relief are moot). And because it would therefore not be "impossible . . . to grant any effectual relief" to remedy the Government's allegedly unlawful behavior, *Chafin*, 568 U.S. at 172, the Applicants' nominal damages claims are not moot.[8]

---

[8] The Government argues Applicants' claims are also nonjusticiable under the consular nonreviewability doctrine or some variation thereof. *See* MTD 29. The Court disagrees. Applicants challenge several policies that allegedly impeded the timely review of diversity-visa applications in general. They do not challenge "a determination in a particular case of matters which Congress has left to executive discretion." *Int'l Union of Bricklayers and Allied Craftsmen v. Meese*, 761 F.2d 798, 801 (D.C. Cir. 1985). So, as other courts have found in similar cases, the doctrine of consular nonreviewability does not apply here. *See Gomez v. Biden*, No. 20-cv-01419, 2021 WL 3663535, at *11 (D.D.C. Aug. 17, 2021); *Tate v. Pompeo*, 513 F. Supp. 3d 132, 142 (D.D.C. 2021).

But, insofar as Applicants seek damages for the Department's alleged violation of the APA, sovereign immunity bars their claim. The APA waives the Federal Government's immunity only as to nonmonetary relief. *See* 5 U.S.C. § 702 ("An action in a court of the United States seeking relief *other than money damages* and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on ground that it is against the United States." (emphasis added)). And claims barred by sovereign immunity must be dismissed for lack of subject matter jurisdiction. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature."); Fed. R. Civ. P. 12(b)(1).

## IV.

Now consider the merits of Applicants' surviving claims.

### A.

Start with the remaining nominal damages claim. In their operative complaints, Applicants ask the Court to award "nominal damages for the violation of [their] statutory, constitutional, and/or procedural rights." Am. Compl. 203; Supp. Compl. 99 (same). The Court has already explained that sovereign immunity bars any APA (i.e., statutory/procedural) nominal damages awards. The only remaining question is whether the Applicants have stated a claim to nominal damages under the Fifth Amendment's Due Process Clause. They have not.

The Supreme Court has recognized a freestanding constitutional tort action for monetary damages against federal officials. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). But "it is well established that *Bivens* remedies do not exist against officials sued in their official capacities." *Kim v. United States*, 632 F.3d 713, 715 (D.C. Cir. 2011). Applicants sued the individual Defendants in their official capacities, *see* Am.

18

Compl. ¶ 10 (Defendant Blinken "is sued in his official capacity"); Supp. Compl. ¶ 15 (Defendant Miles "is sued in his official capacity"); *id.* ¶ 16 (Defendants John Does 1–70 "are sued in their official capacity"), so they have not stated a cognizable *Bivens* claim.

Moreover, Applicants have not alleged the named Defendants *themselves* violated any plaintiff's constitutional rights, a necessary predicate to a *Bivens* claim. *See Iqbal*, 556 U.S. at 676 (noting that "vicarious liability is inapplicable to *Bivens* and § 1983 suits, [so] a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution"). As to those named Defendants, the Applicants doubly fail to state a claim.

**B.**

Finally, consider the Rehabilitation Act claim. Applicants allege the Department violated Section 504 of the Rehabilitation Act, *see* 29 U.S.C. § 794(a), by implementing certain medical-examination requirements and failing to make those examinations more available. *See* Am. Compl. ¶¶ 951–971.

"To prove a violation of Section 504, . . . plaintiffs must show that (1) they are disabled within the meaning of the Rehabilitation Act, (2) they are otherwise qualified, (3) they were excluded from, denied the benefit of, or subject to discrimination under a program or activity, and (4) the program or activity is carried out by a federal executive agency or with federal funds." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008); *cf. Alexander v. Was. Metro. Area Transit Auth.*, 826 F.3d 544, 546 (D.C. Cir. 2016) (noting that a person is disabled under the ADA "if he: (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment"). The Applicants have failed to plead facts

supporting such a violation—indeed, their complaints nowhere allege that *any* plaintiff suffers from a disability. Thus, the Rehabilitation Act claim will be dismissed.

## V.

In sum, the Applicants' claims to injunctive, mandamus, and declaratory relief are moot due to the expiration of the fiscal year. Their nominal damages claims are not moot, but the APA claim is barred by sovereign immunity and the complaints do not allege facts supporting damages under *Bivens*. And the Applicants fail to state a claim under the Rehabilitation Act because they have not alleged any of them suffers from a disability. The Government's Motion to Dismiss will therefore be granted and this case dismissed. A separate Order will issue today.

Dated: May 12, 2022                                         TREVOR N. McFADDEN, U.S.D.J.